**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| **ROBERT HOOKS; ASHLEY HOOKS;** ) | |
| **L.H., a minor, by and through her** ) | |
| **father and mother as her next best friend;** ) | |
| **and R.H., a minor, by and through her** ) | |
| **father and mother as her next best friend,** ) | |
| ) | |
| **PLAINTIFFS,** ) | |
| ) | |
| **v.** ) | **CASE NO: _____** |
| ) | |
| **ALABAMA DEPARTMENT OF** ) | |
| **HUMAN RESOURCES; NANCY** ) | |
| **BUCKNER, COMMISSIONER of DHR,** ) | |
| **individually and in her official capacity;** ) | |
| **MICHELLE WOOD, DIRECTOR OF** ) | |
| **ELMORE COUNTY DHR, individually** ) | |
| **and in her official capacity; LATORA** ) | |
| **BALDWIN, CASE AGENT for** ) | |
| **ELMORE COUNTY DHR, individually** ) | |
| **and in her official capacity; APRIL** ) | |
| **POWERS, SUPERVISOR for ELMORE** ) | |
| **COUNTY DHR, individually and in her** ) | |
| **official capacity; STACY, whose full** ) | |
| **name is otherwise unknown at this time,** ) | |
| **SUPERVISOR for ELMORE COUNTY** ) | |
| **DHR, individually and in her official** ) | |
| **capacity; THE HEALTH CARE** ) | |
| **AUTHORITY FOR BAPTIST** ) | |
| **HEALTH, AN AFFILIATE OF UAB** ) | |
| **HEALTH SYSTEM, D/B/A BAPTIST** ) | |
| **MEDICAL CENTER EAST; BRANDY** ) | |
| **COX, agent for The Health Care** ) | |
| **Authority for Baptist Health, an affiliate** ) | |
| **of  UAB Health System, d/b/a Baptist** ) | |
| **Medical Center East, individually and in** ) | |
| **her official capacity,** ) | |
| ) | |
| **DEFENDANTS.** ) | |

**PLAINTIFFS DEMAND TRIAL BY STRUCK JURY.**

1

## COMPLAINT

## JURISDICTION AND VENUE

1. This Honorable Court has jurisdiction over Plaintiffs' federal claim pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), 42 U.S.C § 1983, and supplemental jurisdiction over Plaintiffs state law claims pursuant to 28 U.S.C. § 1367.

2. Venue is proper in the Middle District of Alabama under 28 U.S.C. § 1391(e). Defendants, as well as Plaintiffs, reside in this judicial district. All of the acts and omissions by Defendants giving rise to this action occurred in this judicial district.

## PARTIES

3. Plaintiff Robert Hooks ("R.H." or "Parents" (when referring to R.H. and A.H)) is a resident citizen of Elmore County, Alabama and is the father of the minor child in the above referenced case.

4. Plaintiff Ashley Hooks ("A.H." or "Parents" (when referring to R.H. and A.H)) is a resident citizen of Elmore County, Alabama and is the mother of the minor child in the above referenced case.

5. L.H., a minor, ("L.H.") is a resident citizen of Elmore County, Alabama and is the minor child that is the subject of this litigation, by and through her parents, as her next best friend.

6. R.H., a minor, ("minor R.H.") is a resident citizen of Elmore County, Alabama and is the sister of the minor child that is the subject of this litigation, by and through her parents, as her next best friend.

7. Defendant State of Alabama Department of Human Resources ("DHR") is a governmental entity established by law.

8. Defendant Nancy Buckner ("Buckner") is over the age of 19 and believed to be a resident of the State of Alabama. She is the Director of Defendant State of Alabama

Department of Human Resources who is sued in her individual capacity and in her official capacity acting as an agent of DHR.

9.      Defendant Michelle Wood ("Wood") is over the age of 19 and believed to be a resident of the State of Alabama. She is the Director of the Elmore County Department of Human Resources, a division of Defendant State of Alabama Department of Human Resources, who is sued in her individual capacity and in her official capacity acting as an agent of DHR.

10.     Defendant Latora Baldwin ("Baldwin") is over the age of 19 and believed to be a resident of the State of Alabama. Baldwin is the case worker responsible for R.H.'s & A.H.'s case and an employee of Defendant State of Alabama Department of Human Resources. Baldwin is sued in her individual capacity and in her official capacity acting as an agent of DHR.

11.     Defendant April Powers ("Powers") is over the age of 19 and believed to be a resident of the State of Alabama. Powers is the Supervisor responsible for R.H.'s & A.H.'s case and an employee of Defendant State of Alabama Department of Human Resources. Powers is sued in her individual capacity and in her official capacity acting as an agent of DHR.

12.     Defendant Stacy ("Stacy"), whose full name is otherwise unknown, is over the age of 19 and believed to be a resident of the State of Alabama. Stacy is a Supervisor responsible for Parent's case and an employee of Defendant State of Alabama Department of Human Resources after Powers was no longer employed with DHR. Stacy is sued in her individual capacity and in her official capacity acting as an agent of DHR.

13.     Defendant The Health Care Authority for Baptist Health, an affiliate of UAB Health System, d/b/a Baptist Medical Center East ("Baptist") is a Domestic

3

Non-Profit Corporation organized and existing under the laws of the State of Alabama.

14. Defendant Brandy Cox ("Cox") is an employee of The Health Care Authority for Baptist Health, an Affiliate of UAB Health System, d/b/a Baptist Medical Center East. Cox is sued in her individual capacity and in her official capacity acting as an agent of Baptist.

## FACTUAL ALLEGATIONS

15. On May 10, 2021, Plaintiff Parents arrived at Baptist Medical Center East for the birth of their child, L.H. L.H. was born the morning of May 11, 2021.

16. Parents were discharged from the hospital on May 14, 2021, while L.H. remained in the NICU due to being born prematurely. Parents visited L.H. in the hospital every day at every possible allowable time in order for A.H. to breastfeed L.H. and for Parents to take care of the daily needs of L.H. such as changing diapers while L.H. was in NICU.

17. A.H. was discharged from the hospital on May 14, 2021, however, L.H. was required to remain in the NICU until May 17, 2021. Parents informed NICU nurses that they would be present at every feeding time and that the only times they would not be in the NICU to care for their infant would be the times they were not allowed to be present which was 06:00–08:00 and 18:00–20:00. Other than those times, Parents were in the NICU caring for L.H. and A.H. brought breast milk she had pumped every single time just in case it was needed for additional feeding.

18. Medical records for L.H. state that on May 13, 2021, L.H. passed her first stool at 08:00.

19. On May 14, 2021, at 08:00, L.H.'s doctor told Parents that there had been an outbreak of RSV in the NICU and she was waiting on the RSV test for L.H. to come back. At 11:00 the doctor stated that they would be moving babies around and that L.H. had tested positive for RSV. The

doctor also stated that she believed that the lab messed up or that there was a bad batch of tests because none of the babies were showing any symptoms of RSV.  At this feeding on May 14, 2021, L.H. had a stool in her diaper which A.H. changed and a nurse stated, "mom got her first poop." (**This information is contrary to the medical records which state that the first stool was on May 13, 2021 at 08:00.**)

20.    On May 15, 2021, at 08:00, Parents arrived at the NICU again to care for L.H. and at this time they were told that L.H. was in fact negative for RSV and that they would be going home on May 17, 2021.

21.    On May 16, 2021, Parents were set up in a private room with L.H. where they would be staying overnight and leaving on the morning of May 17, 2021.

22.    On May 17, 2021 at 10:20 (**just hours prior to being discharged**) Cox told Parents that L.H. had tested positive for methamphetamines in her meconium but that her urine came back negative and that A.H.'s urine was negative as well.  Cox further stated that Elmore County DHR was on the way.  Parents were never told that the meconium would be tested and never consented to the testing of the meconium.  Medical records are also contradictory concerning the meconium. When R.H. inquired about obtaining other drug tests to show they have not used drugs, Cox informed R.H. that meconium is a one-time test and that another test could not be done. Cox further stated that they would not consider any other evidence that there was no drug use.

23.    Defendant Baldwin arrived at the hospital and **coerced and forced** Parents and L.H.'s paternal grandmother to sign a Safety Plan leaving their newborn infant, L.H., and her sister, minor R.H., only 21 months old, in the care of the paternal grandmother on May 17, 2021.  If they did not sign said Safety Plan with DHR, Parents were told their children would go into foster

care. Parents, L.H., and paternal grandmother were not discharged until 14:20 on May 17, 2021.

24. At 14:41 parents immediately went to Quest Diagnostics to have a drug test done. Quest Diagnostics sent parents to Drug Test Services, LLC in Montgomery to have said testing done. Drug Test Services, LLC called DHR to find out what type of drug test was necessary and they were instructed to administer an 8-panel drug test. Parents took urine tests and hair follicle tests and **paid for said tests out-of-pocket**. Both the urine tests and the hair follicle tests for Parents were both returned with negative urine results on May 18, 2021. On May 18, 2021, Parents and the paternal grandmother took L.H. to Drug Test Services to have a hair follicle test for L.H. Parents each received negative hair follicle results on May 19, 2021. On May 21, 2021, negative test results were received for L.H. **Parents paid out-of-pocket for said test to be completed on L.H.**

25. On May 21, 2021, R.H. contacted DHR to present the negative urine and hair follicle test results for each of the Parents and L.H. to Powers. Powers was not in the office and was instructed by someone named Stacy (full name unknown) that Powers was out of the office and would not be back in and that Stacy would now be over this case. R.H. was in possession of the negative urine and hair follicle tests, as well as a letter from A.H.'s gynecologist showing that she had been prescribed a certain medication, promethazine, which can cause a false positive result for methamphetamines. R.H. requested that the Safety Plan be cancelled and their minor children returned to them since they had shown with these tests that the Safety Plan was not necessary. Stacy stated that she had no intention of cancelling the Safety Plan, despite the negative drug tests and the letter from A.H.'s gynecologist.

26. On or about June 4, 2021, R.H. went to DHR asking again that the Safety Plan be cancelled, however, DHR again refused and scheduled a meeting for June 8, 2021 to discuss the same with the Director present. At said meeting, Defendant Wood failed to appear and the safety plan was cancelled at that time due to the demand of R.H. to cancel the same.

27. After keeping Parent's minor children under a Safety Plan for almost four weeks and restricting their access to their minor children, Wood simply failed to appear for the meeting and the Safety Plan was simply cancelled, i.e., in effect just "let it go" as if there was no harm, no foul.

28. There was no medical history or information in the medical records that indicated any history of improper, illegal, or illicit drug or medication abuse by A.H. prior to or during her pregnancy with L.H. However, during and following the subject labor and delivery, A. H. was given large doses of Magnesium Sulfate, Oxytocin and other drugs and medications, including an epidural anesthetic procedure, any or all of which could have also caused false positive drug test results and the Promethazine was prescribed by the physician, who wrote a letter to DHR stating Promethazine could cause false positive drug tests.

29. R.H. was present during the entire hospital stay, without there being any positive test results or determining in any way whatsoever that R. H. ever had drugs in his system. As the Father of the minor children, R.H. was the appropriate person to retain the care, custody, and control of the L.H. and minor R.H.

30. While DHR coerced and forced a Safety Plan on Parents and the paternal grandmother, they took no steps whatsoever to insure that paternal grandmother or R.H. was negative for drugs. DHR in effect took L.H. and minor R.H. away from the biological parents because of false allegations of drug use and placed them in the home of another person that they never drug

tested to determine if that was a safe environment and got no other information from the paternal grandmother other than her name and address.  While the entire time, none of the Defendants would accept the drug tests and information that had been provided to refute the allegations of drug use.

31.   There was never any indication whatsoever in the medical records that L.H. was experiencing any withdrawal symptoms after falsely testing positive for illegal drugs.

32.   A.H. was unable to bring L.H., her newborn infant home and lost custody of minor R.H., only 21 months old at the time, without any knowledge that she would not be able to bring L.H. and minor R.H. home until a few hours before they were being discharged.  A.H. cried herself to sleep every night and was subjected to severe mental and emotional distress immediately after giving birth to the point that she could no longer produce breast milk for her newborn, L.H.

33.   The Safety Plan dated May 17, 2021, which was coerced and forced upon Parents by DHR for L.H. and minor R.H. mandated the following:

- That the minor children, L.H. and minor R.H., reside in the home of the paternal grandmother;

- That DHR will monitor with phone calls and home visits;

- That Parents are only allowed supervised visits, and were to be supervised by the paternal grandmother;

- That there be a drug assessment, random drug screens, and parenting classes.

Even though Parents could show that they had not used drugs, they were required to comply with this Safety Plan or risk losing their children to foster care.

34.   Said Safety Plan states that L.H.'s meconium tested positive on May 14, 2021.  Parents freely

provided care and comfort for L.H. during the time she was in NICU, which was from the time she was born on May 11, 2021 through May 17, 2021, and they were never informed that there was ever an issue with a positive drug test until two (2) hours or less prior to being told they would be discharged from Baptist.

35. The meconium test was shown as positive for methamphetamines on May 14, 2021, however, DHR did not show up at the hospital until May 17, 2021. In fact, Parents' discharge with L.H. was delayed because DHR was "on the way."

36. DHR's own protocol, as it relates to Allegations Involving Substance Affected – Exposed Children, provides for what information must be collected and assessed. (Attachment 1, see page 6) DHR did not collect or assess any information or perform an adequate investigation into the safety and permanency needs of L.H. and minor R.H.

37. DHR's own protocol further does **NOT** require that a child be removed from the custody of their parents, nor does it require that a Safety Plan be initiated.

38. On July, 23, 2021, A.H. was found "indicated" by DHR as having committed child abuse/neglect and is now on the State child abuse/neglect registry.

39. L.H. and minor R.H. were deprived of the love and affection of Parents and each other and deprived of the ability to bond with Parents and each other as siblings during such crucial and formative ages. L.H. was a newborn infant, and it was a crucial time for her brain development, a time to promote attachment, and a time to develop a bond with Parents.

## CAUSES OF ACTION

### COUNT I
### PURSUANT TO 42 U.S.C. § 1983
### Fourth, Fifth and Fourteenth Amendments
### Failure to Provide Due Process, and
### DHR's Policies and Procedures are Unconstitutional
### Against DHR, Buckner, Wood, Baldwin, Powers, and Stacy (DHR and Its Agents)

40. Defendant DHR has developed policies and procedures (DHR Protocol to Allegations Involving Substance Affected – Exposed Children attached hereto as Attachment 1) with regards to seizing children from parents.

41. Said policies and procedures are in violation of all Plaintiffs', as well as other parents and children, constitutional rights of due process as guaranteed by the 4th, 5th, and 14th Amendments of the United States Constitution.

42. DHR's policies and procedures do not afford Plaintiffs, as well as other parents outside of this lawsuit who are or have been in this exact situation, the right to an immediate hearing prior to or after the seizure of children from parents.

43. These same policies and procedures force parents, under the threat of foster care, to sign a Safety Plan which deprives them of the right to the care, custody and control of their minor children.

44. DHR's own policy states, "Per policy (CA/N Allegations And Definitions), when the report is received before the infant is discharged from the hospital, child welfare staff must: make in-person contact with the mother, the infant, hospital medical staff prior to the infants discharge, the mother's and infant's address must be verified (e.g., relatives, Medicaid records, and a home visit must be made within twelve (12) hours after the infants discharge. During the investigative process it is necessary to determine whether the child may remain safely in the

home while treatment and services are provided to address the conditions which place the child at risk of serious harm. Safety assessment involves identifying and evaluating safety threats, and assessing parents' or primary caregivers' protective capacities. Child welfare staff shall be alert to safety threats and implement safety plans (in home, out-of-home [non foster care]) as needed at any time during the assessment."

45. DHR and its agents did not follow their own policies and procedures at all. **DHR and its agents did not do a safety assessment**, they simply did nothing other than implement a Safety Plan which the parents were coerced and forced to sign and agree to under threat of their children being placed into foster care.

46. DHR and its agents did not ask the father or the paternal grandmother to submit to a drug test, did not assess what drugs the mother may have taken to give a false positive test, did not take into consideration that L.H.'s urine test was negative, that A.H.'s urine test was negative, that L.H. had no symptoms of withdrawal and that there was no other evidence whatsoever of any drug use on behalf of the parents. DHR and its agents simply forced the parents to sign a Safety Plan under threat of foster care without doing any type of safety assessment.

47. Parents each submitted themselves and L.H. to urine and hair follicle tests which showed negative drug test results, had evidence that they had not used drugs, and that these meconium test results could be a result of A.H.'s prescription for Promethazine which her gynecologist stated could produce a false positive. Parents were required to comply with this plan or risk losing their children to foster care.

48. DHR and its agents immediately removed the L.H. and minor R.H. from the home of the parents without completion of a proper safety assessment and investigation, DHR and its agents simply removed L.H. and minor R.H. from the Parents' home for almost 4 weeks,

11

without due process, without benefit of any hearing before the Court. This pattern and practice by DHR and its agents is unconstitutional and detrimental to parents' and their children.

49. Said actions of DHR and its agents denied all Plaintiffs and/or other parents outside of this lawsuit who are or have been in this exact situation, of the love and affection that parents and children should be able to enjoy without due process of law.

50. DHR and its agents, over the years, has shown a pattern and practice of removing children from their homes and parents unconstitutionally and without due process.

51. Said actions subjected Parents, L.H. and minor R.H. to extreme mental and emotional anguish; undue hardship; and deprived them of their constitutional rights as stated to unlawful search and seizure and due process.

52. That DHR and its agents, while acting under color of law, deprived all Plaintiffs of their constitutional rights thereby violating 42 U.S.C. §1983.

**CAUSES OF ACTION**
**COUNT II**
**PURSUANT TO 42 U.S.C. § 1983**
**Fourth, Fifth and Fourteenth Amendments**
**Illegal Search and Seizure**
**Against Baptist**

53. Defendant Baptist seized the meconium of L.H. without the consent of Parents' or even the Parents' knowledge that the meconium would be tested.

54. Said seizure and testing constitutes an illegal search and seizure and violates the 4th, 5th and 14th Amendments to the Constitution.

55. On May 14, 2021, L.H. had a stool in her diaper which A.H. changed and a nurse stated, "mom got her first poop." (**This information is contrary to the medical records which state that**

**the first stool was on May 13, 2021 at 08:00.**)

56. The meconium test was shown as positive for methamphetamines on May 14, 2021, however, DHR did not show up at the hospital until May 17, 2021. In fact, Parents' discharge with L.H. was delayed because DHR was "on the way."

57. There was no medical history or information in the medical records that indicated any history of improper, illegal, or illicit drug or medication abuse by A.H. prior to or during her pregnancy with L.H.

58. Neither Baptist nor Cox would allow Parents to contradict or provide any information showing this test to be a false positive.

59. Said actions of Baptist in testing the meconium constituted an illegal search and seizure and therefore, a violation of the Plaintiffs' constitutional rights under the 4th, 5th and 14th amendments to the Constitution.

60. That DHR and its agents, while acting under color of law, deprived all Plaintiffs of their constitutional rights thereby violating 42 U.S.C. §1983.

**COUNT III**
**PURSUANT TO 42 U.S.C. § 1983**
**Civil Rico Conspiracy**
**Against DHR, Buckner, Woods, Baldwin, Powers, Stacy (DHR and Its Agents),**
**Baptist and Cox**

61. DHR and its agents, Baptist, and Cox, while acting in concert, conspired to violate the Plaintiffs' Constitutional Rights of DUE Process as guaranteed by the 4th, 5th, and 14th Amendments of the United States Constitution.

62. DHR and its agents, Baptist, and Cox's actions in seizing custody and control over L.H. and minor R.H., without the benefit of a court hearing, was illegal, oppressive, and immoral.

63.    On May 17, 2021 at 10:20 (**just hours prior to being discharged**) Cox told Parents that L.H. had tested positive for methamphetamines in her meconium but that her urine came back negative and that A.H.'s urine was negative as well.  Cox further stated that Elmore County DHR was on the way.  When R.H. inquired about obtaining other drug tests to show they have not used drugs, Cox informed R.H. that meconium is a one-time test and that another test could not be done.  Cox further stated that they would not consider any other evidence that there was no drug use.

64.    Defendant Baldwin arrived at the hospital and **coerced and forced** Parents and L.H.'s paternal grandmother to sign a Safety Plan leaving their newborn infant, L.H., and her sister, minor R.H., only 21 months old, in the care of the paternal grandmother on May 17, 2021.  If they did not sign said Safety Plan with DHR, Parents were told their children would go into foster care.  Parents, L.H. and paternal grandmother were not discharged until 14:20 on May 17, 2021.

65.    Said actions of DHR and its agents, Baptist, and Cox, IN CONCERT, was a conspiracy that violated all Plaintiffs' constitutional rights, without Due Process and denied all Plaintiffs of the love and affection of each other without Due Process of law.

66.    That DHR and its agents, Baptist, and Cox, while acting under color of law, deprived all Plaintiffs of their constitutional rights thereby violating 42 U.S.C. §1983.

## COUNT IV
## NEGLIGENCE AND/OR WANTONNESS
## AGAINST ALL DEFENDANTS

67.    At all times relevant to this action, all Defendants had a duty to use reasonable care, skill, and diligence to all Plaintiffs in this action.

68.    At all times relevant to this action, all Defendants had a duty to conduct themselves in a manner

14

which was not reckless or not a conscious disregard of the rights or safety of others.

69. All Defendants failed to exercise reasonable and due care under the circumstances and they recklessly and consciously disregarded the rights of all Plaintiffs, thereby breaching the duty owed to Plaintiffs in the following ways:

   a. Defendants Baptist and Cox failed to notify DHR in a timely manner of the false positive drug test from L.H. Per L.H.'s medical records, the false positive drug test from her meconium was available on May 14, 2021. Baptist and Cox had a duty, under the circumstances, to notify DHR in a timely manner, thereby, allowing DHR time to investigate prior to L.H.'s discharge on May 17, 2021;

   b. DHR, Buckner, Woods, Baldwin, Powers, and Stacy failed to timely investigate the false positive drug test from L.H. DHR, by their own protocol, "shall respond immediately", "upon receiving a referral involving a substance affected/exposed child(ren)." DHR was notified prior to L.H.'s discharge on May 17, 2021 of the false positive drug test;

   c. DHR, Buckner, Woods, Baldwin, Powers, and Stacy failed to properly investigate this matter even after it was shown that A.H. was taking a prescribed drug that her doctor stated could show a false positive test for methamphetamines;

   d. DHR, Buckner, Woods, Baldwin, Powers, and Stacy failed to follow their own protocol when it came to removing L.H. and minor R.H. from Parents' custody;

   e. DHR, Buckner, Woods, Baldwin, Powers, and Stacey failed to follow their own protocol in making sure that children are reunited with their families in a timely manner;

   f. DHR, Buckner, Woods, Baldwin, Powers, and Stacy failed to reasonably reunite Parents' minor children, L.H. and minor R.H., with Parents when it was shown through hair follicle and urine testing that Parents and L.H. were drug free; and

   g. There was no indication whatsoever that L.H. ever had any withdrawal symptoms or that she was ever negatively impacted by any drug use.

70. All Defendants knew or should have known that the failure to exercise reasonable and due care in their notification, investigation, removal of L.H. and minor R.H. from Parents' custody, and initiation of a Safety Plan, would cause severe harm and emotional distress to Parents, L.H., and minor R.H. All Plaintiffs' damages were caused by the recklessness,

carelessness, negligence and wantonness of all Defendants.

71. All Defendants acted with reckless indifference to the harm that all Plaintiffs would suffer due to the separation of L.H. and minor R.H. from Parents due to all Defendants failures to properly investigate the false positive drug result for L.H.

**CAUSE OF ACTION V**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**AGAINST BAPTIST AND COX**

72. All Plaintiffs allege that Baptist and Cox's actions caused A.H. to suffer extreme and severe mental anguish and emotional distress, in that their actions were intentional.

73. Baptist and Cox failed to inform A.H. on May 14, 2021 that L.H. had falsely tested positive for methamphetamines. Baptist and Cox waited until May 17, 2021, as A.H. was preparing for L.H. to be discharged from the hospital, to inform A.H. that L.H. could not be discharged until DHR came to the hospital to meet with A.H. Baptist and Cox knew or should have known that A.H. would suffer emotional distress from this information.

74. Baptist and Cox refused to allow or give Parents' any options to prove that they had not used drugs by reviewing medical records or allowing them to provide hair follicle drug tests that showed that A.H. had no drugs in her system.

75. Baptist and Cox's conduct was extreme and outrageous. L.H. had been in the hospital for three (3) days after Baptist and Cox received L.H.'s false positive drug test, however, by Baptist and Cox's delay in informing Parents of the false positive drug test, they delayed any possible investigation that could have occurred prior to L.H.'s discharge. Due to Baptist and Cox's delay in providing this information, Parents were separated from L.H. and minor R.H. for almost a month.

76. Baptist and Cox's delay in providing this information was a direct cause of Parents being separated from L.H. and minor R.H. by DHR.

77. That the conduct and actions by Baptist and Cox constitutes intentional infliction of emotional distress.

78. Baptist Medical Center nurses and case manager, Cox watched daily as A.H. took excellent care of L.H., feeding and changing her daily. The meconium had been tested and falsely showed a positive result for methamphetamines. A.H. was under such mental and emotional distress that she was no longer able to produce breastmilk for L.H. and A. H. cried herself to sleep every night because of the inability to care for L.H. after L.H. and R.H. had been illegally and unconstitutionally removed from A.H.'s home

79. This intentional infliction of emotional distress was due to Baptist and Cox failing to allow L.H. to prove that she had not been using illegal drugs.

80. No reasonable person could be expected to endure being separated from her children, especially a newborn infant and a 21-month old child, due to a false positive drug test that a hospital failed to inform them of. Further, no reasonable person could be expected to handle being labeled a drug addict due to a hospitals failure to provide adequate testing and oversight of the testing. Finally, A.H. was indicated as the perpetrator of abuse and is now on the Alabama Child Abuse and Neglect Registry because of the actions of Baptist and Cox.

81. As a proximate result, A.H. was subjected to economic loss, severe mental anguish and emotional distress, humiliation, and loss of custody of both of her minor children.

17

**CAUSE OF ACTION VI**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**AGAINST DHR, BUCKNER, WOOD, BALDWIN, POWERS, AND STACY**
**(DHR and Its Agents)**

82.    All Plaintiffs allege that DHR and its Agents' actions caused A.H. to suffer extreme and severe mental anguish and emotional distress, in that their actions were intentional.

83.    DHR and its Agents failed to follow their own protocol to reunite families and children. That DHR and its Agents deprived L.H. of the love, affection and bonding that a newborn needs. That DHR and its Agents deprived A.H. of the love, affection and bonding that a mother needs, deprived L.H. of the love, affection and bonding that a newborn infant needs, and deprived minor R.H. of the love, affection and bonding that a sibling is in need of with a newborn infant sibling. That Parents provided proof that they had not used drugs and DHR and its Agents did not properly investigate the same, thereby depriving R.H., A.H., L.H., and minor R.H. of their love and affection. That DHR and its Agents knew or should have known that emotional distress was likely to result from them separating Parents from L.H. and minor R.H.

84.    That DHR and its Agents continued to refuse to allow or give Parents other options to prove that they had not used drugs by failing to allow them to provide additional hair follicle and urine drug tests that showed that A.H. had no drugs in her system, as well as the letter from A.H.'s gynecologist stating that A.H. had been prescribed a drug that could have caused a false positive test for methamphetamines. That DHR and its Agents' failure to allow Parents options to prove they had not used drugs and by failing to acknowledge the letter written by A.H's gynecologist was extreme and outrageous.

85.    That DHR and its Agents' conduct did cause A.H. extreme emotional distress to the point that she failed to produce breast milk, could not sleep, and constantly cried. Any

18

reasonable person would have experienced such mental and emotional distress had they been in this situation.

86. That the conduct and actions by DHR and its Agents have caused A.H. to be on the Alabama Child Abuse and Neglect Registry as an indicated subject.

87. That the conduct and actions by DHR and its Agents constitutes intentional infliction of emotional distress.

88. As a proximate result, A.H. was subjected to economic loss, severe mental anguish and emotional distress, humiliation, and loss of custody of both of their minor children.

**CAUSE OF ACTION VII**
**NEGLIGENT SUPERVISION**
**AGAINST DHR, BUCKNER, and WOOD**

89. That Defendants DHR, Buckner and Wood, individually and in their official capacity, were negligent in their supervision of Baldwin, Stacy and Powers by failing to supervise them as they failed to properly conduct an investigation and consider the evidence that R.H. and A.H. provided to them that they had not been using drugs. Plaintiffs had evidence to corroborate that they had not been using drugs including evidence of negative hair follicle tests of R.H., A.H. and L.H. and the letter provided by A.H.'s gynecologist regarding the medication he had prescribed which could cause a false positive and Baldwin, Stacy and Powers would not consider said evidence. Further, Baldwin and Powers conducted only one home visit on May 17, 2021, which was on the day L.H. was discharged from the hospital, did a home visit the next day and one other home visit. There was only one follow up phone call. Baldwin, Powers and Stacy further failed to do a complete investigation in that a review of the medical records showed that L.H. had no withdrawal symptoms.

19

90.    Said Defendants had a duty to supervise their employees to ensure that they did not violate their proper protocol and their own policies and procedures, and the law in administering their office.

91.    As a proximate result, Plaintiffs were subjected to economic loss, severe mental anguish and emotional distress, humiliation, and loss of custody of both of their minor children.

**CAUSE OF ACTION VIII**
**TORT OF OUTRAGE**
**AGAINST DHR, BUCKNER, WOOD, BALDWIN, POWERS, AND STACY**
**(DHR and Its Agents)**

92.    All Plaintiffs allege that all DHR Defendants' conduct is extreme and outrageous such that a reasonable person could not be expected to endure said conduct and actions.

93.    That DHR and its Agents continued to refuse to allow or give Parents other options to prove that they had not used drugs by allowing them to provide additional urine and hair follicle drug tests that showed that A.H. had no drugs in her system, as well as the letter from A.H.'s gynecologist stating that A.H. had been prescribed a drug that could cause a false positive test for methamphetamines, and failing in their investigation and review of the medical records which showed that L.H. had no withdrawal symptoms. That there is nothing in DHR's protocol, policies and procedures that requires a Safety Plan to be implemented. That DHR and its Agents filed to determine whether L.H and minor R.H. could remain safely in the home, and to evaluate safety threats, and assess parents' or primary caregivers' protective capacities. They immediately implemented a Safety Plan that was not necessary.

94.    DHR and its Agents conduct in this count was intentional and reckless; extreme and outrageous; and caused severe emotional distress to Parents, so severe that no

20

reasonable person could be expected to endure said conduct and actions.

95. That these actions by the DHR and its Agents constitutes the tort of outrage against Parents.

96. As a proximate result, Parents were subjected to economic loss, severe mental anguish and emotional distress, humiliation, and loss of custody of both of their minor children.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, the Plaintiffs request the following Prayer for Relief:

a. **General damages in an amount to be determined by a fair and impartial jury at trial;**

b. **For special damages in an amount to be determined by a fair and impartial jury at trial;**

c. **For punitive damages in an amount to be determined by fair and impartial jury at trial;**

d. **Award of costs of suit, including attorneys' fees under 42 U.S.C. § 1983;**

e. **Declaratory judgment that defendants' actions violated Plaintiffs' rights under the First, Fourth, and Fourteenth Amendments to the U.S. Constitution and state law; and,**

f. **All other, further, and different relief to which Plaintiffs may be justly entitled.**

**Respectfully** submitted this the 8th day of June, 2023.

*/s/Lee A. Rankin*
**LEE A. RANKIN (SHU018)**
**ATTORNEY FOR PLAINTIFFS**
**P.O. Box 877**
**MILLBROOK, ALABAMA 36054**
**334-285-0682**
**leerbooth@yahoo.com**

*/s/John D. Norris*
**JOHN D. NORRIS (NOR044)**
**ATTORNEY FOR PLAINTIFFS**
**P.O. Box 241**
**MILLBROOK, ALABAMA 36054**
**334-285-0682**
**norrisj@bellsouth.net**