IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

ROBERT HOOKS, *et al*.,          )
                                 )
      Plaintiffs,           )
                                 )
v.                         )     CIVIL CASE NO. 2:23-cv-369-ECM
                                 )            [WO]
ALABAMA DEPARTMENT OF     )
HUMAN RESOURCES, *et al.*,    )
                                 )
      Defendants.       )

## MEMORANDUM OPINION and ORDER

## I.  INTRODUCTION

Plaintiffs Robert Hooks ("Father"), Ashley Hooks ("Mother") (collectively "Parents"), L.H. ("Infant Child") and R.H. ("Minor Child") (collectively, the "Plaintiffs") bring this action, pursuant to 42 U.S.C. § 1983 and Alabama state law, against Defendants Baptist Health, an Affiliate of UAB Health System, d/b/a Baptist Medical Center East ("Baptist Health"); Alabama Department of Human Resources ("DHR"); Nancy Buckner, the Commissioner of DHR ("Buckner"); and DHR employees Latora Baldwin ("Baldwin"); April Powers ("Powers"); Stacy Reed ("Reed"); and Michelle Wood ("Wood") (collectively, the "Defendants").  In their amended complaint ("complaint") (the operative complaint), the Plaintiffs allege that their rights under the United States Constitution were violated based on the Defendants' acts and omissions arising out of Baptist Health's "seizure" and testing of "the meconium of Infant Child without the consent of Parents or even the Parents' knowledge that the meconium would be seized or tested,"

(doc. 28 at 10, para. 44), and the subsequent removal of both Infant Child and Minor Child from the Parents' custody.  The Plaintiffs also allege that the Defendants violated Alabama state law under theories of negligence, wantonness, intentional infliction of emotional distress, and the tort of outrage.  Additionally, the Plaintiffs bring a negligent supervision claim under Alabama law against DHR, Buckner, and Wood.  Buckner, Baldwin, Powers, Reed, and Wood are sued in their official and individual capacities.

In response, Baptist Health moved to dismiss the claims, asserting that its alleged conduct fell outside the statute of limitations and that the Plaintiffs failed to state a claim upon which relief could be granted. (Doc. 30).[1]  DHR, Baldwin, Buckner, Powers, Reed, and Wood also moved to dismiss, asserting that all claims against Buckner are due to be dismissed, that they are all entitled to immunity under the Eleventh Amendment to the United States Constitution, qualified immunity, state immunity, state-agent immunity, and that the Plaintiffs failed to state a claim on all state law claims. (Doc. 32).

The motions are fully briefed and ripe for review. After careful consideration, the Court concludes that Baptist Health's motion (doc. 30) is due to be granted, and the remaining Defendants' motion (doc. 32) is due to be granted in part and denied in part.

## II.  JURISDICTION AND VENUE

The Court has original subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331.  The Court has supplemental jurisdiction over the Plaintiffs' state law

---

[1] The motion is filed by Baptist Health and Brandy Cox.  Brandy Cox was named as a Defendant in the Plaintiffs' original complaint but is not named in the amended, operative complaint.  Therefore, Cox is not a party to this action.  The Plaintiffs acknowledge that they abandoned their claim against Cox. (Doc. 36 at 1, para. 5).  Accordingly, to the extent Cox moves to dismiss the complaint, that motion is denied as moot.

claims pursuant to 28 U.S.C. § 1367(a).  Personal jurisdiction and venue are uncontested, and the Court concludes that venue properly lies in the Middle District of Alabama. *See* 28 U.S.C. § 1391.

## III.  LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint against the legal standard set forth in Rule 8:  "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(A)(2).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  At this stage of the proceedings, "the court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor." *Bailey v. Wheeler*, 843 F.3d 473, 478 n.3 (11th Cir. 2016).

The determination of "whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.  The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678. Conclusory allegations that are merely "conceivable" and fail to rise "above the speculative level" are insufficient to meet the plausibility standard. *Twombly*, 550 U.S. at 555, 570. This pleading standard "does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at

678 (quotations and citations omitted).  Indeed, "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Id.* (quotations and citations omitted).

## IV.  FACTS[2]

The following facts are alleged in the complaint.  Infant Child was born prematurely on May 11, 2021, at Baptist Medical Center East.  Although Parents were discharged from the hospital on May 14, 2021, Infant Child remained in the neonatal intensive care unit ("NICU").  While Infant Child was in the NICU, Mother would breastfeed Infant Child and brought pumped breast milk in case it was needed for additional feeding.  Either on May 13 or May 14, 2021, Infant Child had her first bowel movement, also known as a "meconium." (Doc. 28 at 5, para. 22).  On May 15, 2021, Parents were informed that Infant Child would be discharged on May 17, 2021, and on May 16, 2021, Parents stayed overnight with Infant Child in preparation for discharge.

At 10:20 a.m. on May 17, 2021, a nurse informed Parents that Infant Child "had allegedly tested positive for methamphetamines in her meconium but that her urine came back negative and that Mother's urine was negative as well." (*Id.*).  The nurse further informed Parents that Elmore County DHR had been called and that Parents could not leave with Infant Child.  When Father asked about other drug tests, the nurse told him that "they would not consider any other evidence that there was no drug use." (*Id.*).  Father was never

---

[2] The Court recites only the facts pertinent to resolving the Defendants' motions to dismiss.  For purposes of ruling on the motions, the Court accepts the facts alleged in the complaint as true and draws all reasonable inferences in favor of the Plaintiffs. *See Bailey v. Wheeler*, 843 F.3d 473, 478 n.3 (11th Cir. 2016).

drug tested.  According to the complaint, there was no indication in Mother's medical records or medical history of prior illicit drug use or medication abuse, and there was no indication that Infant Child was suffering from withdrawal symptoms.

When Baldwin, a case agent for Elmore County DHR, arrived at the hospital, she told Parents they must sign a Safety Plan naming Father's mother ("Grandmother") as the custodian of both Infant Child and her sister, Minor Child, who was 21 months old at the time.  Baldwin told Parents that if they did not sign the Safety Plan, their children would go into foster care.  Despite no tests being taken on Father, no evidence that he was using drugs, and allegedly no other investigation into his parental fitness, he was not given an opportunity to be the children's caregiver. (*See id.* at 19, para. 81).  "Parents, Infant Child, and [Grandmother] were not discharged until 14:20 on May 17, 2021." (*Id.* at 5, para. 23). At some point that day, Baldwin conducted a home visit.  Baldwin and Powers also conducted "a home visit the next day and one other home visit.  There was only one follow up phone call." (*Id.* at 19, para. 81).

After being discharged from the hospital, Parents had hair follicle and urine drug tests done with the same tests DHR uses to ensure that DHR would accept the results.  On May 18, 2021, the urine tests returned negative results, so Parents and Grandmother took Infant Child to have a hair follicle test performed.  The hair follicle tests for Parents and Infant Child returned negative.  On May 21, 2021, Father contacted DHR to present their negative tests to Powers, but Powers was not in the office.  Father was instructed that Reed was in charge of their case going forward.  Father presented the negative tests to Reed, as

well as a letter from Mother's gynecologist explaining that Mother had been prescribed a medication that can cause a false positive result for methamphetamine.  Father asked for the Safety Plan to be cancelled and the children returned, but Reed "stated that she had no intention of cancelling the Safety Plan." (*Id.* at 6, para. 26).

Father returned to DHR on June 4, 2021, again asking that the Safety Plan be cancelled, but DHR again refused.  Instead, DHR scheduled a meeting between Parents and DHR for June 8, 2021, with the intent that Wood—the Director of Elmore County DHR—could be present.  Parents arrived on June 8, 2021, but Wood failed to appear. Because Wood did not appear, "the Safety Plan was cancelled, i.e., in effect just 'let it go' as if there was no harm, no foul." (*Id.* at 7, para. 28).

## V. DISCUSSION

The Plaintiffs filed this action alleging violations of their Fourth, Fifth, Sixth, and Fourteenth Amendment rights (Counts I & II); negligence and/or wantonness (Count III); intentional infliction of emotional distress (Count IV); negligent supervision (Count V); and outrage (Count VI).[3]  The Court will begin its analysis with select constitutional claims and the allegations against Baptist Health, starting with the claims brought pursuant to § 1983 and progressing to the state law claims.  From there the Court will analyze the

---

[3] Under Alabama law, the tort of outrage and intentional infliction of emotional distress ("IIED") are the same claim, which Alabama courts call the tort of outrage. *Wilson v. Univ. of Ala. Health Servs. Found., P.C.*, 266 So. 3d 674, 675 (Ala. 2017) ("[T]he tort of outrage is the same cause of action as intentional infliction of emotional distress.") (citing *Thomas v. Williams*, 21 So. 3d 1234, 1237 (Ala. Civ. App. 2008)); *Shufford v. Integon Indem. Corp.*, 73 F. Supp. 2d 1293, 1300 (M.D. Ala. 1999) ("The court turns first to Shufford's claim of intentional infliction of emotional distress, also known in Alabama as the tort of outrage.").  The Court will consider the allegations pertaining to the IIED claim and the tort of outrage claim together as the tort of outrage, and the IIED claim will be dismissed as duplicative.

remaining Defendants' claims of sovereign immunity and qualified immunity. The Court will end its analysis by examining the state law claims against Buckner, Wood, Baldwin, and Reed in their individual capacities.

## A.      Fifth and Sixth Amendment Claims

In Counts I and II, the Plaintiffs assert that the Defendants violated their constitutional rights under the Fifth and Sixth Amendments. It appears as though the Plaintiffs claim the Defendants violated their Fifth Amendment right to due process and Sixth Amendment right to counsel. (See doc. 28 at 10, para. 45). However the Fifth Amendment's due-process clause is not implicated here because it applies only to the federal government; it does not apply to actions by a state government. *Knoetze v. U.S., Dep't of State*, 634 F.2d 207, 211 (5th Cir. Jan. 12, 1981) ("Yet fifth amendment protection attaches only when the federal government seeks to deny a liberty or property interest.").[4] Further, the Sixth Amendment right to counsel applies to criminal defendants, and thus, has no application here. Consequently, the Fifth and Sixth Amendment claims are due to be dismissed.

## B.      Baptist Health

In Count I, the Plaintiffs allege that the actions of Baptist Health prior to, and on the day of, the Plaintiffs' discharge from the hospital on May 17, 2021, violated their Fourth and Fourteenth Amendment rights. The Plaintiffs further bring state law claims for negligence, wantonness, and the tort of outrage. The facts alleged in the operative

---

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981.

complaint show that all actions by Baptist Health were taken on or before May 17, 2021. Baptist Health asserts that all claims against it are barred by the applicable two-year statute of limitation.  Baptist Health also argues in the alternative that the Plaintiffs fail to state a claim because Baptist Health is not liable under § 1983 for the alleged unlawful actions of their employees, and that Baptist Health is immune from the Plaintiffs' state law claims.

The Plaintiffs do not dispute that Baptist Health's actions related to this suit occurred on or before May 17, 2021, which is more than two years before they filed their complaint.  Rather, the Plaintiffs assert that the applicable statute of limitations is six years under ALA. CODE § 6–2–34; or, in the alternative, that the statute of limitations did not begin to run until the Plaintiffs were informed by their lawyer that their constitutional rights had been violated.  The Plaintiffs further contend that they stated a claim because the "complaint clearly states all causes of action against all the Defendants in this matter and pleads each with enough specificity to survive a Motion to Dismiss." (Doc. 36 at 3).[5]  The Court turns first to the § 1983 claims.

1.  **§ 1983 Claims**

   a.  **Statute of limitations**

The Plaintiffs contend that the six-year statute of limitations from § 6–2–34 applies to their claims because they allege a constitutional violation of their right against unreasonable search and seizure, "which is definitely an action for any trespass to person or liberty," (doc. 36 at 2, para. 8), and § 6–2–34 applies to "[a]ctions for any trespass to

---

[5] Notably, the Plaintiffs' brief in response to the motion to dismiss was woefully lacking in analysis, and thus, was largely unhelpful to the Court.

person or liberty." ALA. CODE § 6–2–34(1).  However, the United States Supreme Court

held that the "residual or general personal injury statute of limitations applies" to all § 1983

actions "where a State has one or more statutes of limitations." *Owens v. Okure*, 488 U.S.

235, 236 (1989).  Alabama's residual personal injury statute of limitation is § 6–2–38,

which provides a two-year limitations period. *McNair v. Allen*, 515 F.3d 1168, 1173 (11th

Cir. 2008) ("[Appellee's § 1983] claim was brought in Alabama, where the governing

limitations period is two years." (citing ALA. CODE § 6–2–38 (1975))); *Douglas v. Roper*,

374 So. 3d 652, 675 (Ala. 2022), *reh'g denied* (Oct. 21, 2022) ("The applicable limitations

period for personal-injury actions in Alabama is two years." (citing ALA. CODE § 6–2–38

(1975))); *see also Owens*, 488 U.S. at 246 n.9 (using ALA. CODE § 6–2–38(l) as an example

of a statute of limitations that should be applied).  Thus, the two-year statute of limitations

under § 6–2–38 applies to the Plaintiffs' § 1983 claims against Baptist Health.  As indicated

above, Baptist Health's alleged actions occurred on or before May 17, 2021, which is more

than two years before the Plaintiffs filed this lawsuit.  Accordingly, the § 1983 claims

against Baptist Health are time-barred.

    Alternatively, the Plaintiffs also argue that their claims did not accrue until the

Plaintiffs had been informed by their attorneys that their constitutional rights had been

violated, presumably within two years of filing the complaint.  For § 1983 claims, "the

statute of limitations does not begin to run until the facts which would support a cause of

action are apparent or should be apparent to a person with a reasonably prudent regard for

his rights." *McNair*, 515 F.3d at 1173.  A cause of action under § 1983 will accrue when

the plaintiff knows or should know "(1) that they have suffered the injury that forms the basis of their complaint and (2) who has inflicted the injury." *Chappell v. Rich*, 340 F.3d 1279, 1283 (11th Cir. 2003); *see also Mullinax v. McElhenney*, 817 F.2d 711, 716 (11th Cir. 1987) ("Section 1983 actions do not accrue until the plaintiff knows or has reason to know that he has been injured.").

The Plaintiffs allege that they were told by a Baptist Health nurse that "Infant Child had allegedly tested positive for methamphetamines in her meconium" on "May 17, 2021 at 10:20" in the morning. (Doc. 28 at 5, para. 22). Thus, on May 17, 2021, the Plaintiffs knew that their baby's meconium had been "seized," which forms the basis of their § 1983 claims against Baptist Health. (*See id.* at 10, para. 45) ("Said seizure and testing constitutes an illegal search and seizure, violation of due process, and violation of right to counsel which are violations of the 4th, 5th, 6th and 14th Amendments to the Constitution."). The Plaintiffs also knew that Baptist Health inflicted the alleged injury because the "seizure" of the meconium occurred at the hospital. While the exact date of the "seizure" and testing of the meconium is unclear based on the factual allegations of the complaint, it must have happened before the Parents were informed of the positive result on May 17, 2021. The Plaintiffs cite no authority for the proposition that, notwithstanding their knowledge of the relevant facts by May 17, 2021, the statute of limitations did not begin to run until their attorneys told them their rights had been violated, and the Court's independent research revealed none.

Here, the statute of limitations for the Plaintiffs' § 1983 claims against Baptist Health began to run on May 17, 2021, because the Plaintiffs knew by that date that the meconium had been "seized" and that Baptist Health "seized" it. *See McDonough v. Smith*, 588 U.S. 109, 115 (2019) (explaining that the limitations period for a § 1983 claim presumptively begins to run "when the plaintiff has 'a complete and present cause of action'" (citation omitted)); *see also Lyons v. Maddox*, 2021 WL 3932039, at *1 (M.D. Ala. Sept. 2, 2021) ("Consequently, the statute of limitations began to run on [the date] when [the plaintiff] knew or had reason to know that [one of the defendants] searched and seized items from him without a warrant.").[6]  This lawsuit was filed on June 8, 2023.  That the Plaintiffs claim they were not aware that their constitutional rights had been violated until they were informed by their attorney does not impact the Court's analysis.  Therefore, the § 1983 claims against Baptist Health are due to be dismissed because they fall outside the applicable two-year statute of limitations.

### b.  Supervisory liability

Notwithstanding the foregoing, the Plaintiffs' § 1983 claims against Baptist Health also fail because, on this record, Baptist Health cannot be held liable under § 1983 for the unconstitutional acts of its subordinates.  The complaint alleges that Baptist Health "seized the meconium of Infant Child." (Doc. 28 at 10, para. 44).  The Plaintiffs do not dispute that Baptist Health, as a public health authority, is a government entity employing the

---

[6] Here, and elsewhere in this Opinion, the Court cites nonbinding authority.  While the Court acknowledges that these cases are nonprecedential, the Court finds them persuasive.

individuals who allegedly seized the meconium.[7] *Cf. Health Care Auth. for Baptist Health v. Cent. Ala. Radiation Oncology, LLC*, 292 So. 3d 623, 631 (Ala. 2019) ("Regardless of how Baptist Health began, it chose to partner with the University of Alabama to become a government-authorized health-care authority."). "[T]o impose § 1983 liability on a [government entity], a plaintiff must show: (1) that his constitutional rights were violated; (2) that the [government entity] had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). The factual allegations in the complaint do not sufficiently allege any policy from Baptist Health; the only policy referenced in the complaint is one from DHR. Thus, the Plaintiffs have not sufficiently alleged that Baptist Health had a policy which inflicted an injury on the Plaintiffs. The alleged facts are also insufficient to show that Baptist Health had a custom which caused the alleged constitutional violation. "In order for a plaintiff to demonstrate a [] custom, it is 'generally necessary to show a persistent and wide-spread practice.'" *McDowell*, 392 F.3d at 1289 (quoting *Wayne v. Jarvis*, 197 F.3d 1098 (11th Cir. 1999)). The complaint alleges that employees of Baptist Health "seized" the meconium of Infant Child for testing. But, an isolated incident does not evidence a "persistent" or "widespread" custom of illegal "seizure," so the second element to impose § 1983 liability on a government entity is not met. *See McDowell*, 392 F.3d at 1290 (concluding that an isolated incident did not establish

---

[7] Even if Baptist Health is a private entity, the Court's analysis and conclusion remains the same.

a persistent or widespread practice).  Because the test requires all three elements be met, and the Plaintiffs failed to provide sufficient allegations for the second element, the Court need not address the remaining elements.  Consequently, Baptist Health is not liable for the alleged actions of its employees and the § 1983 claims against it are due to be dismissed.

### 2.  State law claims

Baptist Health argues that the state law claims against it are due to be dismissed because they are time-barred under § 6–2–38(*l*).  The Plaintiffs do not cite any authority to indicate otherwise or offer a rebuttal to Baptist Health's argument.  The Court will nonetheless analyze whether the statute of limitations has run as to the state law claims.

### a.  Negligence or wantonness

The statute of limitations for negligence and wantonness claims is two years under § 6–2–38(*l*). *Ex parte Capstone Bldg. Corp.*, 96 So. 3d 77, 88 (Ala. 2012) ("We once again reaffirm the proposition that wantonness claims are governed by the two-year statute of limitations now embodied in § 6–2–38(*l*)."); *Bush v. Ford Life Ins. Co.*, 682 So. 2d 46, 47 (Ala. 1996) ("The statute of limitations applicable to a negligence claim is two years."). Under Alabama law, "[a] negligence [and/or wantonness] cause of action accrues as soon as the plaintiff is entitled to maintain the action, i.e., at the time of the first legal injury, regardless of whether the full amount of damages is apparent." *Casassa v. Liberty Life Ins.*, 949 F. Supp. 825, 832 (M.D. Ala. 1996) (alteration in original) (quoting *Long v. Jefferson Cnty.*, 623 So. 2d 1130, 1137 (Ala. 1993)); *see also Russell Petroleum Corp. v. Environ Prod., Inc.*, 333 F. Supp. 2d 1228, 1232 (M.D. Ala. 2004).

The Plaintiffs allege that Baptist Health acted negligently or wantonly when it "illegally seized and tested the meconium," and when Baptist Health "failed to notify DHR in a timely manner of the allegedly positive drug test from Infant Child." (Doc. 28 at 14, para. 62). The alleged illegal seizure and testing of the meconium occurred before May 17, 2021, because that is when Parents were informed of the alleged positive results of the test. The delay in notifying DHR occurred on or before May 17, 2021, because that is when DHR arrived at the hospital. Therefore, the cause of action for both actions accrued, at the latest, on May 17, 2021, even if the Plaintiffs' damages were not fully apparent on that day. The Plaintiffs did not file this lawsuit until June 8, 2023—more than two years after the claims accrued. Thus, the Plaintiffs' claims of negligence and wantonness against Baptist Health are time-barred and due to be dismissed.

**b. Tort of outrage**

The actions as alleged giving rise to the tort of outrage claim against Baptist Health include the following: (1) Baptist Health did not allow or give the Parents "other options to prove they had not used drugs," (doc. 28 at 20, para. 86); (2) Baptist Health failed "in their investigation and review of medical records which showed that Infant Child had no withdrawal symptoms," (*id.*); (3) Baptist Health delayed in notifying the Parents and DHR of the allegedly positive drug test; (4) Baptist Health failed to "provide adequate testing and oversight of the testing," (*id.* at 18, para. 77); and (5) Baptist Health "illegally seized and tested meconium of Infant Child," (*id.* at 16, para. 68). Based on the factual allegations in the complaint, all these actions took place on or before May 17, 2021, the day Parents

were discharged and informed of the allegedly positive drug test.  The tort of outrage has a two-year statute of limitations under § 6–2–38(*l*).  *See Archie v. Enterprise Hosp. & Nursing Home*, 508 So. 2d 693, 695 (Ala. 1987) ("Thus, we hold that the tort of outrage or intentional infliction of emotional distress is governed by the two-year statute of limitations found in § 6–2–38(*l*).").  The alleged actions giving rise to the outrage claim took place outside the two-year statute of limitations; therefore, the claim for the tort of outrage against Baptist Health is barred and due to be dismissed.

For the above reasons, all claims against Baptist Health are due to be dismissed.[8]

## C.    Claims against DHR, and Buckner, Wood, Powers, Baldwin, and Reed in their official capacities

The Plaintiffs bring § 1983 claims and state law claims against DHR, as well as Buckner, Wood, Powers, Baldwin, and Reed in their official capacities.  The Plaintiffs request compensatory damages, punitive damages, and "[d]eclaratory judgment that defendants' actions violated Plaintiffs' rights under the First,[9] Fourth, and Fourteenth Amendments to the U.S. Constitution and state law." (Doc. 28 at 22).  In response, said Defendants have asserted, *inter alia*, that they are entitled to Eleventh Amendment immunity from the § 1983 claims and state sovereign immunity from the state law claims.

---

[8] As stated above in footnote 3, the Plaintiffs' IIED claim is duplicative of the outrage claim; thus, the IIED claim is due to be dismissed as well.

[9] Nowhere in the complaint do the Plaintiffs assert a claim pursuant to the First Amendment.  Accordingly, the Court concludes that the inclusion of a reference to the First Amendment in the Prayer for Relief is an error in drafting.

"[I]n the absence of consent[,] a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment . . . . This jurisdictional bar applies regardless of the nature of the relief sought." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984).  "The Eleventh Amendment bars a suit against state officials when 'the state is the real, substantial party in interest.'" *Id.* (quoting *Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 464 (1945)).  Generally, "a suit against state officials that is in fact a suit against a State is barred regardless of whether it seeks damages or injunctive relief." *Id.  Ex parte Young* provides an exception to the Eleventh Amendment immunity bar in "suits against state officers seeking prospective equitable relief to end continuing violations of federal law." *Jones v. Buckner*, 963 F. Supp. 2d 1267 (N.D. Ala. 2013); *see also Ex parte Young*, 209 U.S. 123 (1908).

Additionally, state sovereign immunity, "which is provided by Article I, § 14 of the Alabama Constitution, prohibits actions against the State." *LeFrere v. Quezada*, 582 F.3d 1260, 1265 (11th Cir. 2009) (citations omitted).  "State officers and employees, in their official capacities and individually, are [] absolutely immune from suit when the action is, in effect, one against the state." *Phillips v. Thomas*, 555 So. 2d 81, 83 (Ala. 1989).

DHR is a state agency, and as such state sovereign immunity bars the state law claims against it, and the Eleventh Amendment bars the § 1983 claims. *See Ex parte Mobile Cnty. Dep't of Hum. Res.*, 815 So. 2d 527, 530 (Ala. 2001); *Thomas v. Buckner*, 2011 WL 4071948, at *6 (M.D. Ala. Sept. 13, 2011).  The same analysis and conclusion applies to

the claims brought against Buckner, Wood, Baldwin, Powers, and Reed in their official capacities. *See Ex parte Mobile Cnty. Dep't of Hum. Res.*, 815 So. 2d at 530 (concluding that state law claims against DHR employees in their official capacities are considered claims against the State and thus barred by § 14 of the Alabama Constitution, and that the Eleventh Amendment barred the § 1983 claims against DHR employees sued in their official capacities); *see also Thomas*, 2011 WL 4071948, at *6.

Further, the request for declaratory relief is also barred by sovereign immunity.  As stated earlier, the *Ex parte Young* exception is for *prospective* equitable relief.  "In other words, a plaintiff may not use the doctrine to adjudicate the legality of past conduct." *Summit Med. Assocs. v. Pryor*, 180 F.3d 1326, 1336–37 (11th Cir. 1999).  Here, the Plaintiffs have requested a declaratory judgment for an alleged past violation of federal law, which falls outside the *Ex parte Young* exception.  Moreover, a federal court "cannot order the defendants who are state officials and entities to comply with state law." *Auburn Med. Ctr., Inc. v. Cobb*, 567 F. Supp. 2d 1333, 1340 (M.D. Ala. 2008); *see also Pennhurst State Sch. & Hosp.*, 465 U.S. at 106 (explaining that there is no "greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law").  To allow a federal court to do so would violate the "principles of federalism that underlie the Eleventh Amendment." *Pennhurst State Sch. & Hosp.*, 465 U.S. at 106.

Accordingly, because sovereign immunity applies, all claims against DHR, as well as the claims against Buckner, Wood, Powers, Reed, and Baldwin in their official capacities, are due to be dismissed.

**D.    § 1983 claims against Buckner, Wood, Powers, Baldwin, and Reed in their individual capacities**

Count I and Count II allege constitutional violations under § 1983 against Buckner, Wood, Baldwin, Reed, and Powers.[10],[11]  The alleged violations for each Defendant in their individual capacities are analyzed below.

### 1.  Individual capacity claims against Baldwin and Reed

Based on the factual allegations of the complaint, the Court construes the Plaintiffs' claim in Count I to be that Baldwin's alleged inadequate investigation prior to enacting the Safety Plan and removal of the children from the Parents' custody via enactment of a Safety Plan and Reed's alleged failure to provide adequate process while keeping the children under the Safety Plan resulted in an unreasonable seizure of the children in violation of the Fourth Amendment and the loss of the Parents' right to the care, custody, and control of

---

[10] There is some ambiguity in how the Plaintiffs pleaded Counts I and II.  They could be alternative theories, permitted by Rule 8(d), wherein Count I alleges that DHR's policies and protocols are inconsistent and unconstitutional and Count II alleges the Defendants' failure to follow the policies and protocols was unconstitutional.  Count II could also be construed as an additional claim to Count I, wherein the failure to follow the DHR's protocol contributed to the alleged procedural due process violation.  However, regardless of how the Plaintiffs intended the interplay between Counts I and II, the Defendants neither mentioned this ambiguity nor analyzed Counts I and II separately in their motion to dismiss.  Accordingly, the Court will not analyze Counts I and II separately at this stage of the proceeding.

[11] To the extent that the Plaintiffs assert that the Due Process Clause required a hearing prior to the children's removal (*see* doc. 28 at 13, para. 55), that argument is foreclosed by *Powell v. Ga. Dep't of Hum. Res.*, 114 F.3d 1074, 1082–83 (11th Cir. 1997) ("We readily conclude that it would not be feasible to require a hearing before every such judgment decision by a caseworker.").

their children, thereby violating the Parents' right to procedural due process under the Fourteenth Amendment.[12]

In Count II, the Plaintiffs allege that Baldwin and Reed "failed to follow [DHR] protocol," and "instead immediately implemented a Safety plan removing Infant Child and Minor Child from the home without investigation." (Doc. 28 at 12, para. 53).  The Plaintiffs attached the protocol to the complaint to which they allege the Defendants did not adhere— DHR Protocol to Allegations Involving Substance Affected-Exposed Children ("Protocol")—and do not claim the Defendants failed to follow any other statutes, regulations, or protocols.  The Plaintiffs also allege that the Defendants "immediately removed both of the children from the home of the parents for almost 4 weeks, without due process and without benefit of any hearing before the Court." (*Id.* at 13, para. 55).  The Court construes the Plaintiffs' allegations to be that Baldwin's and Reed's failure to follow the Protocol, as well as the lack of some form of due process prior to the removal, likewise resulted in an unreasonable seizure under the Fourth Amendment and procedural due process violation under the Fourteenth Amendment.  Because both Counts I and II allege violations under the Fourth and Fourteenth Amendments, and Baldwin and Reed assert qualified immunity as to both counts, the Court analyzes both counts together.

"The doctrine of qualified immunity protects government officials [sued in their individual capacities] 'from liability for civil damages insofar as their conduct does not

---

[12] The Plaintiffs' complaint asserts a procedural due process claim but does not raise a substantive due process claim.  The complaint makes no mention of a substantive due process claim and this Court is unable to infer any claims based on substantive due process.

violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "The doctrine protects from suit 'all but the plainly incompetent or one who is knowingly violating the federal law.'" *Maddox v. Stephens*, 727 F.3d 1109, 1120 (11th Cir. 2013) (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir.2002)).  There is a two-step analysis to determine whether qualified immunity is available.  "First, the defendant must show that she acted within the scope of her discretionary authority.  Once the defendant has so shown, the plaintiff must show that the defendant violated the plaintiff's clearly established statutory or constitutional rights." *Lenz v. Winburn*, 51 F.3d 1540, 1545 (11th Cir. 1995) (internal citations omitted).

A government official can prove she acted within her discretionary authority by showing her "actions were undertaken pursuant to the performance of [her] duties and within the scope of [her] authority." *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988) (quoting *Barker v. Norman*, 651 F.2d 1107, 1121 (5th Cir. 1981)).  The Plaintiffs do not dispute that Baldwin or Reed was acting within her discretionary authority, and the Court finds that Baldwin and Reed were acting within the scope of their discretionary authority because they investigated a report of abuse and implemented a Safety Plan in response. *See Ogles v. Buckner*, 2015 WL 4488353, at *11 (N.D. Ala. July 22, 2015).

Having found that Baldwin and Reed were acting within their discretionary authority, "the burden shifts to the plaintiff to demonstrate that qualified immunity is not appropriate." *Smith ex rel. Smith v. Siegelman*, 322 F.3d 1290, 1295 (11th Cir.2003).  To

meet that burden, the Plaintiffs must show that "the facts that [they have] alleged or shown make out a violation of a constitutional right" and that the "right at issue was 'clearly established' at the time of defendants' alleged misconduct." *Pearson*, 555 U.S. at 232 (internal citations omitted).  Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Id.* at 236. For qualified immunity purposes, a right may be clearly established in one of three ways. First, there may be "case law with indistinguishable facts clearly establishing the constitutional right." *Lewis v. City of West Palm Beach*, 561 F.3d 1288, 1291–92 (11th Cir. 2009).  Second, there may be "a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right." *Id.* at 1292.  And third, the law is clearly established when the defendant's conduct was "so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Id.* Alternatively, "[a] right can be clearly established either by similar prior precedent, or in rare cases of obvious clarity." *Plowright v. Miami Dade Cnty.*, 102 F.4th 1358, 1366 (11th Cir. June 5, 2024) (quoting *Brooks v. Warden*, 800 F.3d 1295, 1306 (11th Cir. 2015)).

In a qualified immunity analysis, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that [her] conduct was unlawful in the situation [she] confronted." *Terrell v. Smith*, 668 F.3d 1244, 1255 (11th Cir. 2012) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-

existing law the unlawfulness must be apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal citation omitted). "The inquiry whether a federal right is clearly established 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Maddox*, 727 F.3d at 1121 (quoting *Loftus v. Clark-Moore*, 690 F.3d 1200, 1204 (11th Cir. 2012)). "At its core, the question is one of fair notice." *Terrell*, 668 F.3d at 1255 (quoting *Saucier*, 533 U.S. at 202).

### a. Constitutional violation

### i. Baldwin

Accepting the Plaintiffs' factual allegations as true, the Plaintiffs have sufficiently pled that Baldwin violated their constitutional rights when she enacted a Safety Plan that removed both children from Parents' custody without providing pre-deprivation due process, without conducting an adequate investigation of the positive meconium test, and failing to follow the appropriate Protocol. In *Doe*, the Eleventh Circuit explained that "a state may not remove a child from parental custody without judicial authorization unless there is probable cause to believe the child is threatened with imminent harm." *Doe v. Kearney*, 329 F.3d 1286, 1295 (11th Cir. 2003). When determining whether a child's removal was justified and does not violate due process, courts must "consider *all* relevant circumstances, including the state's reasonableness in responding to a perceived danger *as well as* the objective nature, likelihood, and immediacy of danger to the child." *Id.* (emphases in original). The Eleventh Circuit has instructed courts to consider all relevant circumstances because "due process is a flexible concept—particularly where the well-

22

being of children is concerned—and deciding what process is due in any given case requires a careful balancing of the interests at stake, including the interests of parents, children, and the state." *Id.* at 1297. The facts of an individual case will implicate the interests to varying degrees, "which will necessarily affect the degree of procedural due process required." *Id.* As to the Fourth Amendment, a plaintiff must show that she was "seized without probable cause." *Crider v. Williams*, 2022 WL 3867541 (11th Cir. Aug. 30, 2022).

The Plaintiffs have sufficiently pled facts to show that Baldwin lacked probable cause to believe that both Infant Child *and* Minor Child were threatened with imminent harm by both parents. According to the complaint, Baldwin removed both children from both parents' custody based solely on the Infant Child's meconium test results indicating methamphetamine use. The newborn baby's meconium tested positive for methamphetamines, and although reasonable officials in Baldwin's position could infer that Mother may have been the source, that inference does not extend as far as Father under the facts alleged. Indeed, the Plaintiffs allege that Baldwin never gave Father "an opportunity to be the caregiver even though no tests whatsoever had been taken from him." (Doc. 28 at 5, para. 24). Accepting the factual allegations as true and drawing all reasonable inferences in the Plaintiffs' favor, Baldwin did not interview Mother or Father or take any other investigatory steps before she removed both children from both Parents' custody. Plaintiffs allege that the medical reports did not show that Infant Child was experiencing withdrawal and that Infant Child's urine test and Mother's urine test were

both negative.  Additionally, Plaintiffs claim that Baldwin did not follow DHR Protocol relating to children exposed to substances.[13]  According to the Plaintiffs, DHR protocol does not require initiation of a Safety Plan, nor does it require that a child be removed from the parents' custody.

In contrast, the case worker in *Doe* received two documented reports of severe sexual abuse involving John Doe (one of the plaintiffs) and a report from the Florida Department of Law Enforcement documenting John Doe's criminal past. *Doe*, 329 F.3d at 1298.  There, the case worker "investigated diligently and acted almost immediately after the relevant facts came to her attention," but she also "did not rush to judgment or react impulsively." *Id.*  Rather, the caseworker "consulted with both her supervisor and [Florida Department of Children and Family Services] legal counsel before taking steps toward removing the Doe children." *Id.* at 1299.  "Even then, [the caseworker] did not remove the children until after she interviewed both the parents and children and determined the children were unsafe." *Id.* at 1298–99.  Considering all of those circumstances, the Eleventh Circuit held that the caseworker did not violate the plaintiffs' right to procedural due process. *Id.* at 1299.

Under the allegations here, unlike the caseworker in *Doe*, Baldwin acted on a single piece of inculpatory information regarding one child (the meconium test results), ignored exculpatory information (Infant Child's and Mother's negative urine test results), and then

---

[13] Although "the mere failure to follow state procedures does not necessarily rise to the level of a violation of federal procedural due process rights," *Maddox*, 727 F.3d at 1124 n.15, the Plaintiffs allege more than a mere failure to follow state policies and procedures.

removed *both* children from *both* parents' custody without first speaking to the parents or conducting any other investigatory steps. At this stage, and accepting the Plaintiffs' factual allegations as true,[14] the Plaintiffs have sufficiently pled that Baldwin lacked probable cause to believe that Infant Child was in objectively imminent danger sufficient to justify Baldwin's removal of both children from both parents without some additional due process. Moreover, the Plaintiffs do not allege, nor can the Court infer, that it was not feasible for Baldwin to provide some additional process. Thus, the Plaintiffs have sufficiently alleged facts to show that Baldwin violated the parents' due process rights.

The Plaintiffs have also sufficiently pled that Baldwin lacked probable cause to seize the children under the Fourth Amendment.[15] To the extent that these claims are brought on behalf of Infant Child and Minor Child, they may proceed. However, a "'Fourth Amendment child-seizure claim belongs only to the child, not to the parent.'" *Crider*, 2022 WL 3867541, at *6 (citing *Southerland v. City of New York*, 680 F.3d 127, 143 (2d Cir. 2012)). Accordingly, the Parents lack standing to maintain a Fourth Amendment claim as to the seizure of their children and the Fourth Amendment claims asserted by the Parents are due to be dismissed.[16]

---

[14] The Court also observes that *Doe* was an appeal from a ruling at the summary judgment stage, whereas this case is only at the pleadings stage.

[15] To the extent the Parents make a claim for seizure of the meconium, that claim is against Baptist Health and is time barred as explained above.

[16] Although none of the parties addressed this jurisdictional issue, it is one that must be raised by the Court *sua sponte*.

### ii. Reed

Under the facts alleged, the Plaintiffs have sufficiently pled that Reed violated their Fourth and Fourteenth Amendment rights by seizing the children and by not affording them adequate process while keeping the children under the Safety Plan. The Eleventh Circuit explained in *Doe* that a court must carefully balance "the interests at stake, including the interests of parents, children, and the state." *Doe*, 329 F.3d at 1297. Here, "the state has a compelling interest in removing children who may be abused." *Foy*, 94 F.3d at 1536. At the same time, the Plaintiffs have a "constitutionally protected liberty interest in the care, custody, and management of their children." *Doe*, 329 F.3d at 1293; *see, e.g.*, *Stanley v. Illinois*, 405 U.S. 645, 651 (1972). Accepting the complaint's factual allegations as true, the Parents' interest in the care and custody of their children arguably outweighs the state's interest in removing them because when Reed was responsible for Parents' case, the evidence indicating drug abuse or other danger to either child was dwarfed by considerable evidence that there was no drug abuse. Father provided Reed with (1) negative urine and hair follicle drug test results for Father, Mother, and Infant Child, using the same tests as DHR; and (2) a letter from Mother's gynecologist stating that Mother had been prescribed a medication which can cause a false positive result for methamphetamines. Notwithstanding her knowledge of this information, and without undertaking any additional investigation or providing Parents an opportunity to be heard, Reed allegedly refused to cancel the Safety Plan and continued to keep both children out of Parents' custody for several weeks. In balancing the interests under the particular circumstances of

this case, the Court concludes that the Plaintiffs have sufficiently pled facts to show that Reed continued the seizure of the children and failed to afford adequate due process to Parents before the meeting scheduled on June 8, 2021.  Moreover, the complaint does not allege or permit the inference that it was not feasible for Reed to provide some additional process, and Reed does not argue as much.  Thus, at this stage, the Plaintiffs have sufficiently pled that Reed's continued seizure of the children violated their Fourth Amendment rights and that her retention of the Safety Plan under the facts alleged violated the Plaintiffs' Fourteenth Amendment right to due process.

### b.  Clearly established law

### i.  Baldwin

Caselaw from the United States Supreme Court and the Eleventh Circuit, including *Doe*, provides fair notice to any reasonable person in Baldwin's position that her conduct, if it occurred, would violate the Plaintiffs' constitutional rights under the Fourth and Fourteenth Amendments.  Although *Doe* addressed different factual circumstances, the reasoning of the case and the broad statements made therein are sufficient to place reasonable officials on notice that a paltry investigation resulting in removal of children from their parents' custody, under the factual circumstances alleged here, would subject them to § 1983 liability.  When determining whether a right is clearly established, "there need not be a case 'on all fours,' with materially identical facts, before [the court] will allow suits against" officials. *Holloman v. Harland*, 370 F.3d 1252, 1277 (11th Cir. 2004) (quoting *United States v. Lanier*, 520 U.S. 259, 269 (1997)).  "A principle of constitutional

law can be 'clearly established' even if there are 'notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct at issue violated constitutional rights.'" *Id.* (quoting *Lanier*, 520 U.S. at 269). As explained above, *Doe* reasoned that "a state may not remove a child from parental custody without judicial authorization unless there is probable cause to believe the child is threatened with imminent harm," and probable cause is determined by considering "*all* relevant circumstances, including the state's reasonableness in responding to a perceived danger *as well as* the objective nature, likelihood, and immediacy of danger to the child." *Doe*, 329 F.3d at 1295 (emphasis in original). Moreover, both the Eleventh Circuit and the Supreme Court have extolled that "parents have a constitutionally protected liberty interest in the care, custody and management of their children." *Doe*, 329 F.3d at 1293; *see also Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) ("[A] natural parent's 'desire for and right to companionship, care, custody, and management of his or her children' is an interest far more precious than any property right." (quoting *Lassiter v. Dep't of Soc. Servs. of Durham Cnty.*, 452 U.S. 18, 27 (1981))). This fundamental liberty interest provides another broad principle under which state officials must operate when they are considering whether to remove children from their parents' custody.

These principles are sufficient to place reasonable officials on notice that conduct such as Baldwin's alleged conduct is unlawful because, accepting the Plaintiffs' factual allegations as true, the circumstances were not sufficiently emergent to justify the removal of two children from both their parents' custody based on one piece of inculpatory

28

information implicating one child and one parent.  This is particularly true in light of the allegations showing that other drug testing returned negative results, that Mother asserted that drugs prescribed to Mother during pregnancy could cause a positive drug screen, the alleged failure to conduct a more thorough investigation before removing the children, and Baldwin's alleged failure to follow DHR's applicable Protocol.

Baldwin cites to *Foy v. Holston*, 94 F.3d 1528 (11th Cir. 1996), to support her invocation of qualified immunity.  Baldwin's reliance on *Foy* is misplaced.  Notably, *Foy* was before the court on a motion for summary judgment, not a motion to dismiss.  Although the Eleventh Circuit said in *Foy* that "state officials who act to investigate or to protect children where there are allegations of abuse *almost* never act within the contours of 'clearly established law,'" the Court did not articulate a categorical rule that a state official investigating child abuse is automatically entitled to qualified immunity.  *See Foy*, 94 F.3d at 1537 (emphasis added).  Moreover, the Eleventh Circuit in *Foy* stated that a state actor must have "sufficient justification" when interfering with a protected liberty interest. *Id.* at 1536.  As detailed above, the Plaintiffs have sufficiently alleged that Baldwin did not have sufficient justification for her removal of the children from the parents' custody.

The Court notes that further factual development may alter the qualified immunity analysis at a later stage of the litigation.  But at this juncture, Baldwin is not entitled to qualified immunity.  Consequently, to the extent the Defendants moved to dismiss Counts I and II against Baldwin in her individual capacity, the motion is due to be denied.

### ii. Reed

The Plaintiffs allege that, on or about May 21, 2021, Reed failed to cancel the Safety Plan and return the children to their parents even after she was presented evidence refuting the initial positive drug test.  The Safety Plan remained in place until at least June 8, 2021. The parties have not presented any caselaw from Alabama's highest court, the Eleventh Circuit, or the Supreme Court pertaining directly to the constitutionality of delayed return of children to their parents when a Safety Plan is in place. *See Valderrama v. Rousseau*, 780 F.3d 1108, 1112 (11th Cir. 2015) ("To determine whether a right was clearly established, we look to binding decisions of the Supreme Court of the United States, [the Eleventh Circuit], and the highest court of the relevant state.").  In the absence of "case law with indistinguishable facts clearly establishing the constitutional right," the question becomes whether a broad statement of principle clearly established the right, or whether the officials' actions were "so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Maddox*, 727 F.3d at 1121.  At this stage, the answer here is yes.

Accepting the factual allegations as true, it would have been clear to reasonable officials in Reed's position that her conduct was unconstitutional.   The information available to Reed did not support keeping the Safety Plan—which separated six-day-old Infant Child and 21-month-old Minor Child from their parents—in place for several weeks without some additional due process.  While there was an allegedly positive meconium drug test, both Mother's and Infant Child's urine tests came back negative at the hospital,

and Father provided Reed with negative drug results from a lab that used the same drug tests as DHR as well as a letter from Mother's gynecologist explaining that the medication she was prescribed could create a false positive for methamphetamines. Reasonable officials would not, under the facts alleged, believe that continued seizure of two young children without further investigation, after receipt of information refuting the initial evidence of danger, did not implicate the constitutional rights of the children and parents. Thus, the Plaintiffs have adequately pled that Reed's actions violated their clearly established Fourteenth Amendment right to procedural due process, and the childrens' Fourth Amendment right to be free from unreasonable seizure.

Again, further factual development may alter the qualified immunity analysis at a later stage of the litigation. But currently, accepting the Plaintiffs' allegations as true, Reed is not entitled to qualified immunity. Consequently, to the extent the Defendants moved to dismiss Counts I and II against Reed in her individual capacity, the motion is due to be denied.

### 2. *Individual capacity claims against Powers*

The Plaintiffs' well-pleaded factual allegations about Powers are limited. The Plaintiffs allege that Father contacted DHR and was informed that "Powers was not in the office and Father was instructed by Defendant Reed that Powers was out of the office and that Reed would be over their case from this point forward." (Doc. 28 at 6, para. 26). In Count V, the Plaintiffs allege that Powers, together with Baldwin, "conducted one home

visit on May 17, 2021 . . . did a home visit the next day and one other home visit." (Id. at 19, para. 81).

Thus, the Plaintiffs' factual allegations are limited to Powers conducting three home visits and being away from the office on one occasion when Father tried to call her. Without more, these allegations are insufficient to show that Powers violated the Plaintiffs' clearly established constitutional rights or that Powers violated state law under theories of negligence, wantonness, or outrage. Thus, the state law claims and § 1983 claims against Powers in her individual capacity are due to be dismissed for failure to state a claim.

### 3. *Individual capacity claims against Buckner and Wood*

The Plaintiffs allege in Counts I and II that Buckner, as the Commissioner of DHR, and Wood, as the Director of Elmore County DHR, are "responsible for creating and interpreting [DHR's] Policies and Procedures," and "responsible for the actions and inactions of all employees of DHR." (Doc. 28 at 10–11, 12–13). It appears that the Plaintiffs are alleging that Buckner and Wood are liable as supervisors for the actions of Powers, Baldwin, and Reed because Buckner's and Wood's policies resulted in a deliberate indifference to constitutional rights.

For a supervisor to be held liable under § 1983, either the supervisor must have personally participated in the alleged constitutional violation or there must be a "causal connection between actions of the supervising official and the alleged constitutional deprivation." *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999). The Plaintiffs do not allege that Buckner or Wood personally participated in the incident; therefore, Buckner

and Wood may be liable under § 1983 only if "there is a causal connection between [their] actions . . . and the alleged constitutional deprivation." *See id.*   There are three ways to establish a causal connection.   First, when "a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he or she fails to do so." *Myrick v. Fulton Cnty.*, 69 F.4th 1277, 1298 (11th Cir. 2023).   Second, when "a supervisor's custom or policy results in deliberate indifference to constitutional rights." *Id.*   Third, a causal connection may be established when the "facts support an inference that the supervisor directed subordinates to act unlawfully or knew that subordinates would act unlawfully and failed to stop them from doing so." *Id.*

The factual allegations in the complaint are insufficient to establish a history of widespread abuse, nor do they support an inference that either Buckner or Wood directed their subordinates to act unlawfully or that they knew their subordinates would act unlawfully and failed to stop them.   As to the second method, "to prove that a policy or its absence caused a constitutional harm, a plaintiff must point to multiple incidents, or multiple reports of prior misconduct by a particular employee." *Ingram v. Kubik*, 30 F.4th 1241, 1254 (11th Cir. 2022), *cert. dismissed*, 142 S. Ct. 2855 (2022) (quoting *Hartley*, 193 F.3d at 1269).   "[A]llegations of a single incident of unconstitutional conduct cannot state a claim for supervisory liability, even when the conduct involves several subordinates." *Id.* Here, the Plaintiffs have pointed to a single event that allegedly resulted in constitutional harm:  the taking and delayed return of Infant Child and Minor Child.   The Plaintiffs did not allege multiple incidents or multiple reports of prior misconduct by any Defendant

DHR employee.  Moreover, their allegation that there is a "pattern and practice by DHR, Buckner, [and] Wood" is a conclusory allegation which is not adequately supported by factual allegations in the complaint.  Therefore, because the complaint fails to state a claim against Buckner and Wood for supervisory liability under § 1983, those claims in Count I and Count II against Buckner and Wood in their individual capacities are due to be dismissed.

**E.    State law claims against Buckner, Wood, Baldwin, and Reed in their individual capacities.**

The Plaintiffs allege that Buckner, Wood, Baldwin, and Reed are liable for negligence (Count III), wantonness (Count III), and the tort of outrage (Count VI).  The Plaintiffs further allege negligent supervision against Buckner and Wood (Count V).  In response, the Defendants assert both state and state-agent immunity as well as a failure to state a claim.  The Court will address the claims of immunity first.

### 1.  State immunity

Buckner, Wood, Baldwin, and Reed first claim that they are immune based on state (or sovereign) immunity.  Claims against officers in their *official* capacity are barred by Art. I, § 14 of the Alabama Constitution.  To the extent these defendants claim entitlement to sovereign immunity under § 14 of the Alabama Constitution as to the *individual* capacity claims, this argument fails because a favorable result for the Plaintiffs would not directly affect a contract right or property right of the State, and it would not result in a recovery of money from the State.  Rather, those claims "seek[] [] to recover monetary damages against the official 'in [his or her] individual capacity'" which is "of course, not an action against

that person in his or her official capacity and would of necessity fail to qualify as 'an action against the State' for purposes of § 14." *See Ex parte Ret. Sys. of Ala.*, 182 So. 3d 527, 534 n.4 (Ala. 2015) (quoting *Ex parte Bronner,* 171 So. 3d 614, 622 (Ala. 2014)).

### 2. *State-agent immunity*

Although the Defendants are not entitled to sovereign immunity for claims brought against them in their individual capacity, state agents "who [are] not protected by absolute State immunity may nonetheless be eligible for the more limited defense of State-agent immunity for certain acts performed as part of [their] official duties." *Ex parte Pinkard*, 373 So. 3d 192, 202 (Ala. 2022). "State-agent immunity protects state employees, as agents of the State, in the exercise of their judgment in executing their work responsibilities." *Ex parte Hayles,* 852 So. 2d 117, 122 (Ala. 2002). The Alabama Supreme Court has established a burden-shifting framework when a party raises the defense of state-agent immunity. A state agent must first demonstrate "that the plaintiff's claims arise from a function that would entitle the State agent to immunity." *Ex parte Est. of Reynolds*, 946 So. 2d 450, 452 (Ala. 2006) (citing *Giambrone v. Douglas*, 874 So. 2d 1046, 1052 (Ala. 2003)). If the State agent makes such a showing, the burden then shifts to the plaintiff to "demonstrate that one of the exceptions to state-agent immunity applies." *Johnson v. Dunn*, 2024 WL 1076802, at *34 (N.D. Ala. Mar. 12, 2024). There are two exceptions pursuant to *Cranman*: "(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise"; and "(2)

when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." *Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000).

The state-agent immunity analysis largely tracks that of qualified immunity. *Cantu v. City of Dothan*, 974 F.3d 1217, 1236 (11th Cir. 2020).  To that effect, "the same facts that establish an officer is not entitled to qualified immunity 'also establish that [she] is not entitled' to state agent immunity." *Id.* (quoting *Hunter v. Leeds*, 941 F.3d 1265, 1284 (11th Cir. 2019)).  Additionally, the Alabama Supreme Court has explained that determining whether state agent immunity applies "should be reserved until the summary-judgment stage, following appropriate discovery." *Ex parte Ala. Dep't of Mental Health & Retardation*, 837 So. 2d 808, 814 (Ala. 2002).  The Alabama Supreme Court has also stated that "unless the inapplicability of all the *Cranman* exceptions is clear from the face of the complaint, a motion to dismiss based on State-agent immunity must be denied." *Odom v. Helms*, 314 So. 3d 220, 229 n.3 (Ala. 2020).

The Plaintiffs do not dispute that Buckner, Wood, Baldwin, and Reed were engaged in a function that would entitle them to state agent immunity.  But, as stated, under the *Cranman* exception, "a State agent *shall not* be immune from civil liability in his or her personal capacity . . . when the Constitution or laws of the United States . . . require otherwise." *Ex parte Cranman*, 792 So. 2d at 405 (emphasis in original); *see also Taylor v. Hughes*, 920 F.3d 729, 734 (11th Cir. 2019) (explaining that state agent immunity "shields state employees from tort liability regarding discretionary acts unless they . . .

36

violated federal or constitutional law").   State officials are not entitled to state-agent immunity if their conduct, as pleaded, plausibly violates the United States Constitution. *See, e.g.*, *Taylor*, 920 F.3d at 734–35 (holding that the district court erred in granting summary judgment in favor of state officials based on state agent immunity because the state officials "potentially violated [the plaintiff's] constitutional rights by being deliberately indifferent to his serious medical needs"); *Foster v. Maloney*, 785 F. App'x 810, 818–19 (11th Cir. 2019) (per curiam) (concluding that state officials were not entitled to state-agent immunity at the motion to dismiss stage because, in light of the court's conclusion that the plaintiff plausibly alleged that the officials violated her federal constitutional rights, "it necessarily follows" that the plaintiff similarly alleged that the officials "were not 'acting in compliance with the law,' and [that] they 'violated federal or constitutional law'" (citing *Taylor*, 920 F.3d at 734–35)); *Huffman v. Dunn*, 2021 WL 2533024, at *8 (N.D. Ala. June 21, 2021) (citing *Taylor* and *Foster*, and concluding that state officials were not entitled to state agent immunity at the motion to dismiss stage where the plaintiff plausibly alleged a violation of her Eighth Amendment rights).

As explained above, the Plaintiffs have plausibly alleged that Baldwin and Reed violated their Fourth and Fourteenth Amendment rights under the United States Constitution.   Thus, it necessarily follows that Baldwin and Reed cannot establish entitlement to state agent immunity at this stage. *See, e.g.*, *Foster*, 785 F. App'x at 818–19; *Huffman*, 2021 WL 2533024, at *8; *McCarley v. Dunn*, 2024 WL 993884, at *16 (N.D. Ala. Mar. 7, 2024) ("Because [the plaintiff] has sufficiently pleaded constitutional

violations, it would be inappropriate for this Court to conclude at this stage that [the defendants] are entitled to state-agent immunity.").  In contrast, Buckner and Wood, who have qualified immunity as to the federal claims against them, are also entitled to state agent immunity because the Plaintiffs have not sufficiently alleged how Buckner and Wood acted willfully,[17] maliciously,[18] fraudulently, in bad faith,[19] or beyond their authority. Accordingly, Buckner and Wood do not meet either *Cranman* exception and are entitled to state-agent immunity as to the state law claims against them in their individual capacities.

Because Baldwin and Reed are not entitled to state-agent immunity, the Court will turn to whether the Plaintiffs have plausibly alleged their state law claims against Baldwin and Reed.

### a.  Negligence and wantonness claims

"To prevail on a negligence claim, a plaintiff must prove that the defendant owed the plaintiff a legal duty, that the defendant breached that duty, that the plaintiff suffered a loss or injury, that the defendant's breach was an actual cause of the injury, and that the

---

[17] "'Willfulness' is the conscious doing of some act or omission of some duty under knowledge of existing conditions accompanied with a design or purpose to inflict injury." *Ex parte Nall*, 879 So. 2d 541, 546 (Ala. 2003) (citing *Roe v. Lewis*, 416 So.2d 750, 754 (Ala. 1982) (willfulness "denotes an intention to cause an injury")).

[18] "[M]alice is defined as '[t]he intent, without justification or excuse, to commit a wrongful act.'" *Ex parte Nall*, 879 So. 2d 541, 546 (Ala. 2003) (citing *Black's Law Dictionary*, 968 (7th ed.1999).

[19] "Bad faith "requires more than a showing of incompetence. Bad faith 'is not simply bad judgment or negligence.  It imports a dishonest purpose and means a breach of known duty . . . through some motive of self-interest or ill will.'" *Hill v. Cundiff*, 797 F.3d 948, 981 (11th Cir. 2015) (quoting *Gulf Atl. Life Ins. v. Barnes*, 405 So. 2d 916, 924 (Ala. 1981)).

defendant's breach was a proximate cause of the injury." *Haddan v. Norfolk S. Ry. Co.*, 367 So. 3d 1067, 1072 (Ala. 2022).  To prevail on a wantonness claim, a plaintiff must show that the defendant (1) consciously did some act or omitted some duty (2) while knowing of the existing conditions (3) and being conscious that, from doing or omitting an act, injury will likely or probably result. *Motley v. Express Services, Inc.*, 386 So. 3d 766 (Ala. 2023).

The Defendants do not offer any caselaw or analysis to support their assertion that the Plaintiffs failed to state a negligence or wantonness claim.  The Defendants focus their analysis and argument on the invocation of state-agent immunity; however, this Court determined that Baldwin and Reed, at this juncture, are not entitled to state-agent immunity.  Accordingly, at the motion to dismiss stage, the Court finds that the Plaintiffs have plausibly alleged negligence and wantonness claims against Baldwin and Reed and the motion to dismiss those claims is due to be denied.

### b. Tort of outrage

The Plaintiffs allege they have a viable outrage claim because the Defendants' conduct was "intentional and reckless; extreme and outrageous; and caused severe emotional distress to Father, Mother, Infant Child, and Minor Child, so severe that no reasonable person could be expected to endure said conduct and actions." (Doc. 28 at 21). The Defendants argue that the Plaintiffs failed to state a claim because the "basis for the allegedly outrageous conduct in regard to the implementation of a safety plan, which was lifted within weeks of implementation . . . [does] not meet the level of egregious conduct." (Doc. 32 at 27–28).

To establish a tort of outrage, a plaintiff must show: "(1) that the defendants either intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from their conduct: (2) that the defendants' conduct was extreme and outrageous; and (3) that the defendants' conduct caused emotional distress so severe that no reasonable person could be expected to endure it." *Parks v. Mut. of Omaha Ins.*, 2020 WL 3791884, at \*3 (N.D. Ala. July 7, 2020) (quoting *Callens v. Jefferson Cnty. Nursing Home*, 769 So. 2d 273, 281 (Ala. 2000) (citations omitted)).  "The tort of outrage is an extremely limited cause of action." *Potts v. Hayes*, 771 So. 2d 462, 465 (Ala. 2000).  The paradigm cases in which the Alabama Supreme Court has recognized it are: "(1) wrongful conduct in the family-burial context; (2) barbaric methods employed to coerce an insurance settlement; (3) and egregious sexual harassment." *Wilson v. Univ. of Ala. Health Servs. Found., P.C.*, 266 So. 3d 674, 676 (Ala. 2017) (citations omitted).  While the tort of outrage is not limited to those three categories, *id.*, the challenged conduct must "be so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society," *Jenkins v. U.S. Fid. & Guar. Co.*, 698 So. 2d 765, 768 (Ala. 1997); *see also T.R. by & through Brock v. Lamar Cnty. Bd. Of Educ.*, 25 F.4th 877, 891 (11th Cir. 2022) ("Although this case is not within the three scenarios where the Alabama Supreme Court has found outrage before, the tort of outrage is not limited to those three situations.").

The Court finds the allegations supporting the tort of outrage sufficient to survive a motion to dismiss.  As a preliminary matter, "the question whether a plaintiff has met the

burden of proof sufficient to support a tort-of-outrage claim . . . is typically appropriately addressed at the summary-judgment stage rather than at the pleading stage." *Swain v. AIG Claims, Inc.*, 2019 WL 5284748, at *7 (Ala. Civ. App. Oct. 18, 2019); *see also Parks v. Mut. of Omaha Ins.*, 2020 WL 3791884, at *4 (N.D. Ala. July 7, 2020) ("While outrage claims can be dismissed at [the motion to dismiss] stage of litigation, this court agrees that, in this instance, the facts need to be developed before pronouncing a decision on this claim."). The Plaintiffs have sufficiently pled their state law claims, and the motion to dismiss is due to be denied as to the state law claims against Baldwin and Reed in their individual capacities.

## VI.   CONCLUSION

Accordingly, for the reasons stated, and for good cause, it is

ORDERED that Baptist Health's motion to dismiss (doc. 30) is GRANTED, and Baptist Health is DISMISSED from this case. It is further

ORDERED that DHR, Buckner, Wood, Powers, Baldwin, and Reed's motion to dismiss (doc. 32) is GRANTED in part and DENIED in part as follows:

1. The motion is GRANTED as to all claims against DHR, Powers, Buckner, and Wood; and DHR, Powers, Buckner, and Wood are DISMISSED from this case;

2. The motion is GRANTED as to all claims against Baldwin and Reed in their official capacities;

3. The motion is GRANTED as to the Fourth Amendment claims (Counts I and II) brought by the Parents;

4. The motion is GRANTED as to the Fifth and Sixth Amendment claims (Counts I and II) against Baldwin and Reed in their individual capacities;

5. The motion is GRANTED as to the Plaintiffs' claim for intentional infliction of emotional distress (Count IV);

6. The motion is DENIED as to the children's § 1983 Fourth Amendment seizure claims and as to the Plaintiffs' Fourteenth Amendment due process claims (Counts I and II) against Baldwin and Reed in their individual capacities;

7. The motion is DENIED as to the state law negligence, wantonness, and outrage claims against Baldwin and Reed in their individual capacities.

DONE this 27th day of September, 2024.

_____/s/ Emily C. Marks_____
EMILY C. MARKS
CHIEF UNITED STATES DISTRICT JUDGE